Case number 17-7106, Don Bennett and Al Appellix v. Google LLC. Mr. Jordan for the Appellix, Mr. Roach for the Appellee. Good morning, Your Honor. Good morning, Mr. Jordan. My name is Harry Jordan and I represent the appellants here, Don Bennett and D.J. B. Holdings. This appeal has its origin in a blog filed by a disgruntled subcontractor of D.J. Holdings. In that, he accused the appellants of unethical conduct. More specifically, they didn't pay their bills, they were dishonest, and basically attempted to alert the public, this is some people you did not want to deal with. When the appellants learned about the blog, which was published in Google, they attempted to get Mr. Pearson, who was the subcontractor, to remove it, and he refused. That having not worked, they went to Google. They got in contact with a gentleman by the name of David Drummond, who was the chief legal officer of Google, and it was pointed out that they were publishing this offensive blog. It was pointed out that Google has guidelines as to what would be acceptable material for blogs. They had an enforcement procedure and asked them to remove it. Nothing was heard from Mr. Drummond or any other officials at Google. What the parties then did was the appellants filed a lawsuit in the district court against Google. They did not include Mr. Pearson for two reasons. One, he had a history of instability and were concerned that filing a lawsuit with him would just encourage him to file more blogs and cause more harm to the appellants. Secondly, he had gone through a series of bankruptcy proceedings, and so that the ability to do anything really effective was remote. The suit was opposed, obviously, by Google. They filed a motion to dismiss on the grounds that they were immune from liability under the Communications Decency Act. The judge in the district court agreed. He made a specific finding that Google was the publisher, Pearson was the third-party content provider, and it was clear under the statute there was no liability. He dismissed the suit. We filed this appeal because one of the main reasons for dismissing that suit by the district court was the lawsuit involving another case which was decided by the circuit and became the basis of why we're here today again, and that was Clayman v. Zuckerberg. In that case, Mr. Clayman, who subscribed to Facebook, discovered that there had been some blogs submitted and published encouraging Muslims to kill Jews, and obviously he was upset by that since he was Jewish. He ended up asking that the blog be removed. It's a little unclear in the facts, but apparently that was not done at his request, but it was done later when an Israeli official asked to be done. The case went to, didn't go to trial, but there was a motion again filed under the Decency Act in that case, and what the court did found both Facebook and its owner immune from liability under the same provisions of the Decency Act. Now, in that case, interestingly enough, the court noted that what is and is not a publisher to be immune from liability and the status of a content provider of the third party was an issue that had not been decided in this court as far as what is the outer limits. There had been a case before that in the Ninth Circuit, which said in effect that you can be both a service provider and a service or a content provider. You may be liable on one aspect of it and not on another. There weren't enough facts in this case, the claimant case, for the court to make that decision. When the district court found in favor of Google in this proceeding here in the lower court, I think the issue was presented, and that's the basis of our appeal. And it is basically this. Is Google responsible here as both a publisher, which would actually make it immune, but is it a partial provider of the content of the blog, and therefore there is some liability? We think there's sufficient facts here for the court to make that determination, unlike in the claimant case. And the reason we say that is the specific provisions of the guidelines that Google has and how they enforce them. Unlike in the claimant case, which is distinguishable because Facebook as a condition to accepting its service to a particular pattern, signed a disclaimer. It required the people to sign a disclaimer where they admit that there wasn't any liability, any warranty, absolutely no responsibility on the part of Facebook. Differently in the provisions that Google has, they indicate certain categories of conduct or material that they didn't believe was suitable for publication, and they indicate that, and this is important, I think, they encourage the public to alert them if they saw such type of offenses, and if they did, Google said it will investigate it, and if it found that it did, it would block it, drop it, and several other actions. I believe that that particular guidelines and the way it's enforced addresses the issue as to whether they are on the outside limits of publication and because they become a major factor in whether the blog is actually published, that they bear responsibility as a information content provider. I think that this is a proceeding that the court with sufficient facts here for it to make that determination or perhaps better, since we did not have a hearing on the lower level, return this to the district court with instructions to develop that issue, and that's the reason why we're here today. All right. Thank you. Thank you. Mr. Branch? Good morning. May it please the Court, I'm John Roach on behalf of the appellee, Google LLC, in this matter, and I'll refer to the appellant as Ms. Bennett for sake of simplicity, and I understand there's a corporate entity involved in the case. As the court knows, the sole issue before the court in this matter is whether a service provider like Google forfeits its immunity from civil suit under the Communications Decency Act when it has content standards that it doesn't enforce to a particular plane of satisfaction. That's the issue that Ms. Bennett has presented to the court here. And there's no dispute that before Ms. Bennett complained to Google about Mr. Pearson's blog, that Google met all three prongs of the standard that's been announced by this court in the Clayman case for immunity under the Communications Decency Act. It's indisputably a provider of interactive computer services in terms of its provision of blog hosting services and Internet search services. The offending blog was provided by another information content provider, specifically Mr. Pearson. And Bennett seeks to hold Google liable as the publisher or speaker of that blog, which is to say she seeks to hold Google liable for publishing that blog or declining to remove it when Ms. Bennett complained. Now, with the agreement that up to that point, before Google was notified about the blog, it satisfied all the criteria for CDA immunity, Ms. Bennett claims that Google forfeited that immunity once she complained and Google did not enforce its content policy to her satisfaction. So the first rationale of the district court is not what you're relying on. It's the second rationale. I mean, district court cites a Fourth Circuit case about the difficulty that your client would have in monitoring. Well, that's one of the reasons why Congress enacted the Communications Decency Act. No, no, no, no, but I'm getting at the point that here your client was put on notice, so the monitoring is not an issue here. Google does have a policy of allowing people to report offending content, and they take a look at it. So it's not an issue of whether that's an appropriate thing to do, to notify Google about something that you think might violate their policy. The terms of their policy, though, make quite clear that they will review the content and they will decide whether or not it violates that policy. And the policy makes very clear that their real default position is that they believe freedom of expression is important, and so they're not just going to willy-nilly remove things. And Ms. Bennett asserts this argument that she's raising, that a service provider forfeits its immunity when it has some sort of terms of service that say, you know, we'll try to keep the service safe or report offending content to us acts as a forfeiture of CDA immunity. But it's not a novel issue at all. So what I was getting at, the district court was quoting the Fourth Circuit when it said it would be impossible for service providers to screen each of their millions of postings for possible problems, close quote. So that's not an issue here. Because Mrs. Bennett notified Google of the offending, what she thought was. It would be impossible for service providers to screen everything. No, but in this case, your client knows what the plaintiff is claiming is the offending block. All right. So then the corporation looks to your standards, your client's standards, and you just said the default is freedom of expression is important and not going to willy-nilly remove something. So I thought the point was that the standards did suggest your client was going to look into this complaint, not commit itself to any action. But it's not a willy-nilly situation. Well, what the Fourth Circuit was talking about in that passage that's quoted is the rationale for CDA immunity. Service providers are not required to take any action, nor do they pledge to necessarily take any action. The CDA was enacted to provide them with an incentive for creating voluntary standards that they may look into content that is complained about to them. Because what was happening, and this was actually discussed in the Roommates.com 9th Circuit case that Mrs. Bennett cites in her opening brief, the CDA was enacted because prior to the CDA there was case law developing that said if a service provider enacts any content standards and doesn't enforce those to someone's particular satisfaction, that person has a case against them. They're liable now because they've said we may look into this, or if you complain to us, we'll look into it. And if they don't look into it quickly enough or do what they've asked them to do, they have a lawsuit against them. And Congress realized that creates a real perverse incentive because what service providers in that case would do is either enact, they would adopt no content standards whatsoever, and that way they would be able to avoid liability for offensive content that they didn't remove. Or if they said, you know, that's a bad policy because we don't want to allow people to just post anything on our servers. What they would then do is they would enact content standards, but then the moment somebody complained about something, they would have to remove it because of what the Fourth Circuit was getting at was that it would be impossible to constantly monitor or to necessarily look into every single complaint that anybody raises. And this case is sort of the quintessential case that Congress was concerned about. Your point is that the statute applies even if they do look at everything now. Correct. It applies regardless. The purpose may have been because you couldn't look at anything, but the language means that even if you do look at everything, you're exempt from liability. And in terms of Ms. Bennett's allegations, she doesn't allege to have actually used Google's tool for reporting an offending blog. She sent a letter to their chief legal officer, which is— That's not relevant to your legal point. It's not. It's not. You're just noting that. Yeah. The legal point is just the language of the statute is extraordinarily broad. Right, and that's the judgment Congress made because of the way the case law was developing prior to 1996 was that service providers were really going to be between a rock and a hard place by either adopting no standards and just putting their head in the sand and in that way saying you can't accuse us of being liable for not removing things because we never told you we would do anything in terms of removing things. Or if they did adopt a standard, any sort of content policy, and they didn't enforce it to a particular point of satisfaction, that plaintiff would suddenly have a lawsuit. Do we know whether they ever examined the complaint? I don't know that. How is she supposed to notify Google? Assuming that the blog is actually hosted by Google, there's a link. This was, wasn't it? There's no question. That's the allegation. Oh, and you deny that? We accept the allegations and the complaint is pled because of where we are at this stage. Well, I will once again just say something that is my own opinion, and that is I think the name of this statute is a misnomer. It should be Communications No Holds Barred Act. I mean, the providers can remove it, they can't be sued, cannot remove it, they can't be sued, and I don't see for the life of me how this promotes decency.  And really it's a judgment that Congress made in 1996 that the situation that was developing with the case law that's discussed in the very case that they said, the BriefTheRoommates.com case, the case law that was developing was creating even worse incentives for service providers to either just say, look, we're going to wash our hands of trying to monitor things because when we tell people we're going to monitor and then they're unhappy with how quickly we monitor or whether we actually act on their complaints, then they sue us. And that's crippling to these companies to have to monitor everything. So the incentive was put your head in the sand and act no standards, and then what you would really have, the Internet would essentially be the Wild West. You would just have to see it. As opposed to what it is. Well, believe it or not, it could be far worse. And so Congress made the judgment if we immunize the service providers, they will, as Google has done, enact content policies that are voluntary and folks can report things. And so if you look at Google's content policy, you can report things like adult content and that sort of thing. This is really the quintessential case that Congress had in mind, though, in terms of protecting service providers. This is a dispute between two people. One person claims she's being defamed. And Google has no way of determining who's telling the truth here. And this is precisely the sort of case. Well, you're making a lot of representations of fact in your argument that aren't part of this record. That's a fair point, Your Honor. I'm trying to explain. You said Google has no ability to investigate and determine. And that's not critical to the district courts. Congressional hearings show that's not its position in any event. A fair point, Your Honor. I'm responding to the characterization of the act as being a failure because I think had the act not been enacted, things would actually be far worse. So you would distinguish the in-bank decision of the Ninth Circuit by saying there was no creation, participation by Google. Correct. And there's no allegation in this case that Google did anything. Mere notice is not enough to make Google a participant. Precisely. And that's what the Fourth Circuit held in Zierin. That's what I think this court held in Clayman. It's an argument that has been rejected specifically with respect to Google in the Obedo case that was affirmed by the Third Circuit side in our brief, the Goddard case out of the Northern District of California. Let me ask you, hypothetically, which one of your content boundaries do you think this comes closest to violating? Would it be the harassment? I can only assume the harassment would be the one they're complaining about. Because hate speech is based on unusual. But Ms. Bennett's argument is by having this policy and not enforcing it the way she wants us to enforce it, we forfeited CDA immunity. And we contend that's precisely the opposite of what the case law shows us. That's the opposite of what Clayman says. It's the opposite of what Obedo, Goddard say. And the cases that they cite, Roommates.com, even the Barrett case, the California Supreme Court case in their reply brief, discusses the statute is imperfect, but the alternative is far worse. And so this is the judgment that Congress has made, to encourage service providers to have these content policies and to do their best to enforce them, but they can't be liable simply by having them. Because that was the state of the law before the CDA, and it created an incentive essentially to do nothing, because otherwise the cost would just be crippling. Do you think it's correctly named? Correctly named? That's an interesting question, Your Honor. It's part of the art of legislating. That's right. That's right. Okay. Thank you. Thank you. Does Mr. Jordan have any time left? Mr. Jordan has just one more minute. All right. Thank you. I think one thing everybody agrees is the statute certainly has some defects. And that's basically what happened. The earlier cases, the Zarin case and what have you, the courts took the approach it's immunity across the board. Google can publish whatever it wants that somebody gives them. They're not responsible for the content. And that's been the pattern of the cases. And finally, the Ninth Circuit stepped in and said, well, wait a minute, the key here is the difference between a publisher and a content provider. And what it did in that case, it found that the publisher overstepped the bounds and became, in effect, at least partially. The definition of a provider, it's providing it in whole or in part. So it doesn't have to do a lot to fall off the end and lose its immunity. What we're saying here is that in the case involving claimant, there's a distinction here because Facebook recognized that it didn't have liability if it published the content of a third party. And it specifically put in the agreement that you had to sign up with Facebook that you recognize that they were not responsible for the content or anything else. Here, what Google has done, Google, in effect, has said, these are the areas where we think are not suitable. And you talked about harassment, I think, in this particular case, revealing personal information about the people would be another one. But what Google did was it enlisted the public. It said, you tell us if you find a blog and we will look at it. And if we believe it violates our rules, it doesn't say, we may take it out, we may do this. It says, we will do one of these things depending on the severity of it. So it's committing itself. It's just more than bringing it to your attention. They're saying, you show us, if it's within the rules, then what we will do is we will enforce it in this way. That's a little different than I think the way it's been described. Now here, of course, what happened was we brought to their attention and we never heard anything. Now, you have something in the statute called the Good Samaritan Provision, which was designed basically for this type of problem. And what it says, that a service provider, if it acts in good faith, and that's the key words, and it decides what it's going to publish or not publish, it is not liable. You have a situation here. And this is exactly what the other side is saying. We acted in good faith. We have a right to do this. There's a lot of cases that we're saying before that notice potentially would make the publisher liable. And they're saying that's not the case here. Our position is that they've stepped beyond just saying we're not responsible, which is what claimant did. They're taking an approach. We want you to be included in the process. We want you to tell us when you find something that's wrong. And if you do, we're going to act in good faith and we're going to find that there's a violation and we will block it, terminate it, or what. The point is we think they have stepped beyond the bounds. They're more than just looking at third-party information or content. They're saying we're going to become a party to whether it continues on the Google. I think that's a step up. I think this is the type of proceeding that more information may be needed. We never had that opportunity because, of course, at the lower level, the district court, what they did was they looked at the bare provisions of the statute. They said, Google, you're a service provider, and this blog came from a third party. It never addressed that did their participation and continuing to have it published is to make it a partial content provider, and that's the issue. Thank you.
judges: Henderson, Rogers, Kavanaugh